UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

TAMMY HALL,

           Plaintiff,

v.                                                     Case No.  5:02-cv-305-Oc-GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

           Defendant.
_____

## ORDER

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 24), and both parties have filed briefs outlining their respective positions. (Docs. 27 & 28.)  For the reasons discussed below, the Commissioner's decision is due to be **REVERSED AND REMANDED** under sentence four of 42 U.S. § 405(g).

## I. PROCEDURAL HISTORY

On April 19, 2000, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging a disability onset date of May 7, 1999. (R. 73-75). Plaintiff subsequently amended her disability onset date to December 1, 1998.  (R. 87.) Plaintiff's application was denied initially and upon reconsideration. (R. 63-64, 66-67.) Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 68.)  After an administrative hearing, the ALJ issued a decision unfavorable to

Plaintiff on May 24, 2002. (R. 57-62.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied. (R. 73-34.) Plaintiff then appealed to this Court. At the Commissioner's request, the Court remanded the case pursuant to sentence six of 42 U.S.C. §405(g), because the hearing tape had been lost. (R. 75-77.) On December 5, 2003, the same ALJ held a supplemental hearing. (R. 35-47.) On January 15, 2004, the ALJ issued a decision unfavorable to Plaintiff. (R. 13-20.) The Appeals Council denied Plaintiff's request for review (R. 7-8), making the January 15, 2004 decision the final decision of the Commissioner. On December 13, 2004, the Court reopened the case. (Doc. 23.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the

---

[1] See 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which

---

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

---

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See Also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. **SUMMARY OF THE RECORD EVIDENCE**

Plaintiff was thirty-eight years old at the time of the ALJ's 2004 decision. (R. 373, 655.) She is a high school graduate (R. 38)[22] with past relevant work as a distribution

---

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18] Walker at 1003.

[19] Wolfe at 1077-78.

[20] *See id.*

[21] *See* Doughty at 1278 n.2.

[22] There is conflicting evidence as to Plaintiff's education. At the hearing, she testified that she is a
(continued…)

service representative, cash control clerk, and dental lab courier. (R. 96, 104.) Plaintiff contends that she is unable to work due to migraine headaches and a possible mild stroke. (R. 95.)

In his review of the record, including Plaintiff's testimony and the medical records from several health care providers, the ALJ determined that Plaintiff suffered from migraine headaches and degenerative changes of the cervical spine at C5-C6 disc level. (R. 17.) However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4. (*Id.*)

The ALJ then found that Plaintiff retains the residual functional capacity ("RFC") to lift and/or carry 50 pounds occasionally, and 25 pounds frequently; sit, stand and/or work for about 6 hours each in an 8-hour workday, but that she should avoid being around dangerous equipment or heights. (R. 18). In reaching this conclusion, the ALJ found the claimant's testimony credible to the extent it established that she experiences migraine headaches but not credible to establish that her impairment is disabling. (R. 17.) The ALJ then determined that Plaintiff was not disabled because she could return to her past relevant work as a cash control clerk. (R. 18.)

On December 1, 1998, Plaintiff went to the emergency room complaining of numbness in both hands, tingling in the lower extremities, distorted vision, headaches, and difficulty concentrating. (R. 124-33.) A CT scan was unremarkable (R. 126) and a cervical spine x-ray showed mild cervical spondylitic changes at C5-C6. (R. 146.)

---

[22](…continued)
high school graduate (R. 38), but there is some evidence that Plaintiff only completed tenth grade. (R. 101).

On December 2, 1998, Amy K. Dorn, M.D. noted that Plaintiff had memory loss, decreased motor function, and numbness. (R. 147.)  On December 8, 1998, Dr. Dorn's Physician's Assistant wrote that Plaintiff was being evaluated for paresthesia[23] but that she was fully capable of performing her job functions, which included driving a motor vehicle. (R. 145.)

On December 14, 1998, Plaintiff was seen by W. Kevin Cox, M.D. for an orthopaedic evaluation of neck pain with left upper extremity and left lower extremity numbness. (R. 134-35.) Review of x-rays of the cervical spine showed mild cervical degenerative changes at C5-C6 level. (*Id.*) Dr. Cox's noted that Plaintiff needed to determine whether she suffered from either a CVA[24] or a TIA.[25]  (*Id.*)

Plaintiff was referred to Martin Menkin, M.D. for a neurological evaluation on December 22, 1998. (R. 167-69.) Plaintiff reported that she has had headaches for the past twenty years but that the headaches that began on December 1, 1998 are different from her normal pattern. (R. 169.) Dr. Menkin concluded that Plaintiff probably suffered from a migraine variant, but that he could not exclude the possibility of a TIA. (R. 168.)

On January 14, 1999, an echocardiogram was performed due to Plaintiff's complaints of palpitations. (R. 143-44, 153.) There was a suggestion of mild mid to late

---

[23] An abnormal sensation of tingling, burning, crawling, or tickling.  See 4-P-PE Attorneys' Dictionary of Medicine 1866.

[24] CVA is the abbreviation for "cerebrovascular accident."  Apparently the term is no longer used medically; stroke is the preferred term.  See 1-C-CG Attorneys' Dictionary of Medicine 3780.

[25] TIA is the abbreviation for "transient ischemic attack"-- a brief period during which the brain does not receive enough blood.  It is manifested by a blurring of vision, slurring of speech, loss of orientation, numbness, etc.  See 5 Attorneys' Dictionary of Medicine 2667.

systolic mitral valve leaflet prolapse with associated trace mitral insufficiency and a trace of tricuspid insufficiency. (*Id.*)

On February 3, 1999 Plaintiff reported to Dr. Menkin that for the previous two weeks she had been experiencing spells on a daily basis in which she had an extremely brief, clearly defined sense that she had passed out. (R. 166.) She reported that she had no numbness or difficulty speaking, thinking or functioning. (*Id.*) Plaintiff also reported that she was experiencing headaches about every two days. (*Id.*) Dr. Menkin noted that Plaintiff's MRI showed an incomplete circle of Willis[26] which was probably benign. (*Id.*)

On February 12, 1999, Plaintiff had a follow-up appointment with Dr. Menkin. (R. 164.) Plaintiff reported that she was continuing to have spells with a brief dizzy sensation and a split second sense that she may have been unconscious for a brief period of time. (*Id.*) Plaintiff further reported headaches every other day but no recurrence of intense left hemicranial headache, right-sided visual loss, left-sided aching numbness. (*Id.*) She also reported some memory difficulties. (*Id.*) Dr. Menkin's impression was "[m]igraine variant versus TIA versus seizure equivalent." (*Id.*)

On March 2, 1999, Plaintiff reported that she was suffering from occasional black outs. (R. 142.) On March 12, 1999, Plaintiff reported to Dr. Menkin that her headaches had diminished in frequency to about one per week, but that over the past ten days she had been having daily headaches due to elevated stress. (R. 163.) Plaintiff further reported that she was still having between one and three spells per week in which she

---

[26] A circular system of communicating arteries at the base or underside of the brain. See 2-CH-CZ Attorneys' Dictionary of Medicine 2282.

felt as though she had lost consciousness for a brief period. (*Id.*) Dr. Menkin's impression was that Plaintiff had a migraine variant with episodic clouding of consciousness, which was potentially compatible with basilar migraine component. (*Id.*)

On April 6, 1999, Plaintiff reported to Dr. Menkin that her headache pattern "has gone back to what she thinks an ordinary person has." (R. 162.) She further reported that the spells had ceased, but that she still had a very slight sense of dizziness. (*Id.*) Dr. Menkin's impression was "migraine variant-basilar artery."

On June 9, 2000, Plaintiff had a follow-up appointment with Dr. Menkin. (R. 161.) Plaintiff reported that she was having headaches about one to two times per week and she often had to go to bed to get relief. (*Id.*) Plaintiff also reported intervals of left-sided body aching reminiscent of the December 1, 1998 events that led to her going to the emergency room. (*Id.*) Dr. Menkin noted that Plaintiff had not been fully compliant in taking her medication. (Id.)

On August 4, 2000, Dr. Menkin noted that for the past three weeks, Plaintiff had been experiencing intense left hemicranial pain two times per day, lasting about three hours at a time. (R. 160.) On September 22, 2000, Plaintiff had a normal MRI of the brain. (R. 136.)

On November 1, 2000, Plaintiff had a follow-up appointment with Dr. Menkin. (R. 158-59.) Dr. Menkin noted that although Topamax was helping to reduce her headache frequency, Plaintiff stopped taking Topamax because it was making her sleepy and nauseous. (R. 159.) Dr. Menkin noted that in September Plaintiff had a throbbing sensation in the right suboccipital that gave way to an intensifying headache that became very severe with nausea and photophobia. (*Id.*) Dr. Menkin further noted that

Plaintiff had been having a significant headache one to two times a week and about twice a month the headaches had become intense throbbing headaches with nausea, vomiting, and photophobia, which she relieved by taking three aspirin and going to sleep.  (*Id.*)  Finally, Dr. Menkin noted that Plaintiff was not having recurrent associated dizziness, loss of consciousness, blindness to the right and heaviness within the left upper extremity has been less severe and had been occurring less frequently.  (*Id.*)

On January 31, 2001, Plaintiff had a follow-up appointment with Dr. Menkin.  (R. 157.)  Dr. Menkin noted that over the past thirty days Plaintiff had increasing symptoms in her left arm and she had been suffering from significant headaches about three times a week with several headaches each month becoming severe headaches with nausea.  (*Id.*) On March 28, 2001, Dr. Menkin noted that Plaintiff's headaches had returned to their baseline of substantial discomfort three to four times a month. (R. 156.)  On August 16, 2001, Plaintiff had a follow-up appointment with Dr. Menkin.  (R. 186.)  Dr. Menkin noted that Plaintiff had been having headaches one to two times per week and several times per month.  (R. 186.)  The intense headaches lasted two to eight hours and Plaintiff had some degree of nausea, while other headaches were shorter and were not accompanied by nausea.  (*Id.*)

Plaintiff testified that she has been suffering from severe migraines since 1998. (R. 43.)  Plaintiff testified that she has migraines two to three times per week, that they last two to eight hours, and that there is a hangover period sometimes the next day.  (R. 38-39).  She further testified that when the pain is severe she sometimes vomits, occasionally has numbness in her left arm  (R. 39-40) and the medicine she takes puts her to sleep.  (R. 39.).  Plaintiff testified that when she does not have a migraine she

takes her son to school, does housework, cooks, shops, watches television and reads (R. 41-42) and she does not have any problems with lifting, standing, walking or sitting. (R. 43.)  However, when she has a migraine she does nothing.  (*Id.*)  Plaintiff testified that she could not perform cashier-type work or route driving when she has a migraine. (R. 42-43.)   Plaintiff testified that she is no longer seeing Dr. Mencken because of the cost of gas, tolls and prescriptions. (R. 44.)

There are two physical residual function capacity ("RFC") assessments of record which were performed by non-examining state agency physicians.  James J. Green, M.D. performed an assessment on April 5, 2001 (R. 170-77) and Hilda Tung, M.D. performed a second assessment on October 27, 2002. (R. 178-85.)  Based on their review of the medical records, Green and Tung concluded that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; push and/or pull without limitation.  Green determined that Plaintiff should never climb ladders, ropes or scaffolds and that she should avoid even moderate exposure to open heights and dangerous machinery. (R. 172, 174.)  Tung determined that Plaintiff should avoid even moderate exposure to extreme heat or extreme cold. (R. 182.)

## IV.  **DISCUSSION**

Plaintiff's primary argument is that the ALJ improperly analyzed her subjective complaints of pain because the ALJ failed to make a proper credibility determination.[27]

---

[27] Plaintiff makes two related arguments -- i.e. that the ALJ erred in determining that Plaintiff could perform her past relevant work and that the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain -- both of which turn on whether the ALJ properly evaluated Plaintiff's subjective complaints of pain.
(continued...)

11

For the following reasons, the Court agrees and concludes that the ALJ's credibility finding was not adequate and it was not supported by substantial evidence.

In evaluating disability, the ALJ must consider all of a claimant's impairments, including her subjective symptoms, such as fatigue, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.[28] The Eleventh Circuit has set forth a three-part test that applies when a claimant attempts to establish disability through his own testimony of pain or other subjective symptoms.[29] The "pain standard", which applies to complaints of subjective conditions other than pain, requires that the plaintiff first produce medical or other evidence of an underlying medical condition. Then the plaintiff must demonstrate either that objective medical evidence confirms the severity of the alleged symptom arising

---

[27](…continued)
Accordingly, the Court will address them together.
    Plaintiff (who was represented at the hearing) also argues that the ALJ failed to fully develop the record by not ordering a consultative examination. See Doc. 27, page 10. Plaintiff contends that the medical records were inadequate for the ALJ to make an informed decision regarding the extent of Plaintiff's migraine problems. See id. The regulations "normally require" a consultative examination only when necessary information is not in the record and cannot be obtained from the claimant's treating medical sources or other medical sources. See Doughty v. Apfel, 245 F.2d 1274, 1281 (11th Cir. 2001)(citing 20 C.F.R. §404.1519a(b)). Here, there are records from several physicians, including Dr. Menkin, a neurologist who treated Plaintiff for migraines for almost two years. Moreover, Plaintiff has not identified any "necessary information" that was not included in the record. Plaintiff contends that the ALJ "clearly pointed out in his decision that the record was lacking functional limitations described by an examining physician." Doc. 27, page 10. However, Plaintiff misconstrues that portion of the ALJ's decision. The ALJ merely concluded that the medical record did not describe severe functional limitations that would support Plaintiff's allegations of severe migraine headaches. (R. 17.) Accordingly, the ALJ was not required to order a consultative examination.

[28] 20 C.F.R. § 404.1528.

[29] Id. at 1560.

from that condition or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged symptom.[30]

If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[31] While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[32] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[33] However, a lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.[34] If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."[35] As a matter of law, the failure to articulate the reasons for

---

[30] Id.

[31] Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[32] Foote at 1562-1563.

[33] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[34] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

[35] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

discrediting subjective pain testimony requires that the testimony be accepted as true.[36]

In the instant case, the ALJ applied the Eleventh Circuit's pain standard "threshold"[37] assessment to Plaintiff's subjective complaints by noting the Plaintiff's complaints of migraine headaches. (R. 17.) While the ALJ did not cite the exact language of the standard, he did state that he "must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 404.1529, and Social Security Ruling 96-7p." (*Id.*) This language, a paraphrase of the pain standard, along with the supporting findings, shows that the ALJ applied the pain standard. Moreover, the ALJ cited 20 C.F.R. § 404.1529, which contains the same language regarding subjective testimony that the Eleventh Circuit interpreted when initially establishing the pain standard.[38]

In applying the pain standard, the ALJ found that Plaintiff met the initial burden of showing an underlying medical condition, migraine headaches, that could be expected to give rise to pain. Once Plaintiff met this initial burden, however, the ALJ found that while Plaintiff's testimony was credible to the extent it established that she experiences migraine headaches, it was not credible for establishing that her impairment is disabling. (R. 17.) The ALJ noted that "the medical record does not describe severe functional limitations or present clinical findings that would support the claimant's allegations of

---

[36] Id. at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[37] Marbury, 957 F.2d at 839.

[38] See Wilson, 284 F.3d at 1226.

severe migraine headaches." (R. 376).  The ALJ articulated two reasons as to why he reached this conclusion.

First, the ALJ noted that the Plaintiff reported to Dr. Menkin that her headaches had returned to their baseline of substantial discomfort three to four times a month. This is consistent with Dr. Menkin's records from Plaintiff's March 28, 2001 appointment. (R. 156.) However, the ALJ ignored the records from Plaintiff's most recent appointment with Dr. Menkin (August 16, 2001) at which she reported that she was having headaches one to two times per week and that the headaches became very intense several times per month. (R. 186.)[39] Plaintiff further reported that the intense headaches lasted two to eight hours and were accompanied by nausea, while the shorter headaches were sometimes very intense and sharp, but were more localized and not accompanied by nausea. (*Id.*) This is consistent with Plaintiff's testimony that she suffers from migraines two to three times per week and that they last between two and eight hours. (R. 39.)  Plaintiff further testified that when the migraines are severe she sometimes vomits and that she has passed out while vomiting on two occasions. (*Id.*)

Second, the ALJ noted that the Plaintiff had not described such debilitating headaches as to preclude her from ususal household chores and daily activities. However, this is simply not true.  Plaintiff testified that when she does not have a migraine, she is able to do household chores, cook, shop, take her son to school, watch

---

[39] The ALJ correctly noted that at that same appointment Plaintiff denied having any loss of consciousness, dizziness, blindness to the right eye and heaviness at the left upper extremity. (R. 17, 186.)

15

television and read.  (R. 41-42.)  However, Plaintiff testified that when she has a migraine she does "absolutely nothing" and she is "dead for hours."  (R. 41-43.)

Thus, the two reasons explicitly articulated by the ALJ to discredit Plaintiff's complaints of pain are not supported by substantial evidence and therefore are not "adequate." Accordingly, because the ALJ's reasons for discrediting Plaintiff's complaints of disabling pain from her migraine headaches was not supported by substantial evidence, this matter is due to be remanded for the ALJ to reconsider the effects of Plaintiff's pain on her ability to perform basic work activities and her ability to perform her past relevant work.

## V.  CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner for the Administrative Law Judge to reconsider the effects of Plaintiff's pain on her ability to perform basic work activities, and to conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter final judgment accordingly, terminate any pending motions and close the file.

**IN CHAMBERS** in Ocala, Florida, on November 21, 2005.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:  Counsel of Record